UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

**AKEEM BROWDER**,                                           :
                                                             :
                              Petitioner,                    :
                                                             :      **MEMORANDUM**
                    – against –                              :      **DECISION & ORDER**
                                                             :
**MICHAEL KIRKPATRICK**,                                     :
                                                             :      16-CV-04047 (AMD)
                              Respondent.                    :
                                                             :
------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The *pro se* petitioner, currently incarcerated at Sing Sing Correctional Facility, petitions

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petitioner was convicted after a

jury trial of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law §

265.03(1)(b)), and sentenced as a predicate felon to a determinate prison term of fifteen years.

The petitioner argues that his trial counsel was ineffective, that the evidence against him was

legally insufficient and that his sentence was excessive.  (ECF No. 1 at 6-13.)  For the reasons

that follow, the petition is denied.

## FACTUAL BACKGROUND[1]

### I.  Overview

In the morning of May 22, 2010, police officers Jimmy Clerge and Juner Cevallos were

on patrol in the Bedford-Stuyvesant neighborhood of Brooklyn when an SUV sped by their

patrol car.  (Trial Record ("Tr.") at 42:1-18).  When the officers tried to stop the SUV, the driver

pulled away.  (*Id.* at 43:15-44:5.)  The officers followed the car, and, at one point, the petitioner

---

[1] Because the petitioner was convicted, the facts are summarized in the light most favorable to the verdict.
*See Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).  The facts are drawn from the full record of the
state court proceeding.

and another man jumped out of the passenger doors; one of them dropped a cellphone. (*Id*. at 44:20-46:20, 69:2-7.) As the petitioner ran, he turned around and fired two shots toward the patrol car. (*Id*.) The officers chased the petitioner, but lost sight of him inside a New York City Housing Authority building. (*Id*. at 54:17-57:19.) A witness identified the cellphone as the petitioner's and detectives arrested him later that afternoon. (*Id*. at 274:13-16.)

The petitioner was charged with attempted murder in the first and second degree, attempted aggravated murder, attempted aggravated assault on a police officer and second degree criminal possession of a weapon. He went to trial before the Honorable Alan Marrus and a jury on March 14, 2012, and was acquitted of the attempted aggravated murder and assault counts, but convicted of the weapon possession count.[2] Judge Marrus sentenced him as a predicate felon to a determinate prison term of fifteen years.

## II.    Pre-Trial Hearing

Prior to trial, the defense moved to suppress the officers' identifications of the petitioner and the petitioner's statements. On January 11, 2012, the Honorable Gustin Reibach held a combined Dunway/Huntley/Wade hearing on the motion. (ECF No. 7-1 at 4.) The prosecution called one witness, Detective Donald Lamanque. (*Id.*)

Detective Lamanque testified that on the morning of May 22, 2010, he received a call reporting "shots fired at police officers" near 997 Dekalb Avenue. (*Id.* at 6.) Detective Lamanque went to the scene and spoke with Officer Cevallos, who told him that two men jumped out of a dark SUV, and one of them, a black male of medium build wearing a white shirt, shot at him and his partner, and that one of the men dropped a cellphone on the ground. (*Id.* at 7-9.)

---

[2] The counts of attempted murder in the first degree and attempted murder in the second degree were not submitted to the jury.

Detective Alexander Grandstaff brought the cellphone back to the precinct.  (*Id.* at 8-9.)
The cellphone rang multiple times, and Detective Grandstaff used a precinct phone to call one of
the numbers.  (*Id.*)  A woman answered and agreed to come to the station.  (*Id.*)  She told the
detectives that the phone belonged to "K.O."  (*Id.*)  She looked through photographs and
identified the petitioner as K.O.  (*Id.* at 9-10.)

Later that morning, Detective Grandstaff created a photographic array that included the
petitioner's photograph and showed the array to Officer Cevallos and Officer Clerge separately.
(*Id.* at 10-11.)  Officer Cevallos identified the petitioner as the gunman.  (*Id.* at 12.)  Officer
Clerge did not make an identification, but said that the shooter was either the petitioner or the
person in the third photograph.  (*Id.* at 16.)

Detectives arrested the petitioner that same day, at about 1:15 p.m.  (*Id.* at 20.)  Detective
Lamanque advised the petitioner of his constitutional rights, which the petitioner waived.  (*Id.* at
25-26.)  The petitioner told the detective that he was at 997 Dekalb Avenue the previous night,
but was not the gunman; he claimed that someone shot at him.  Later that afternoon, the detective
put together a lineup with the petitioner and five fillers; the petitioner selected the fifth position.
(*Id.* at 26-28, 30.)  Officer Clerge viewed the lineup first and identified the petitioner as the
shooter "right away."  (*Id.* at 30-32.)  Officer Cevallos viewed the lineup next; he asked that the
participants turn their heads, and then identified the petitioner "from the shooting."[3]  (*Id.* at 32-
33.)

Judge Reibach ruled that the petitioner's statements and Officer Cevallos's identification
were admissible, but found that the prosecution had not met its burden with respect to Officer
Clerge's lineup identification, given the "relatively short period of time" between the time

---

[3] Before Officer Cevallos looked at the lineup, the detective asked the petitioner if he wanted to change
positions; the petitioner said he did not.  One of the fillers switched positions.  (ECF No. 7-1 at 36.)

Officer Clerge viewed the photographic array and the lineup, and that "the only person in the corporeal lineup who appeared in the photographic identification [was] the petitioner." (*Id.* at 55, 60-61.)  Under these circumstances, it was not clear whether the officer "recognize[d] someone from the crime" or from the photograph he had seen hours before the lineup. (*Id.* at 57.)  Accordingly, the court suppressed Officer Clerge's lineup identification.[4] (*Id.* at 60-61.)

## III.    Trial

    a.    <u>The Prosecution's Case</u>

The petitioner went to trial before the Honorable Alan Marrus and a jury on March 14, 2012.  The prosecution called eight witnesses: Officer Cevallos, Officer Clerge, Detective Grandstaff, Detective Lamanque, Officer Oliver Bagley, Crime Scene Detective Shimicka Meadows, fingerprint analyst Andrew Reitnauer, and DNA expert Samantha Orans.  The prosecution established the following facts.

At approximately 1:00 a.m. on May 22, Officer Cevallos and Officer Clerge were sitting in a marked patrol car on the corner of Marcus Garvey Boulevard and Pulaski Street in Bedford-Stuyvesant when they saw a BMW SUV drive past at a high speed. (*Id.* at 42:1-18.)  The officers turned on their lights and sirens and the SUV pulled over. (*Id.* at 43:9-44:5.)  As the officers walked toward the car, however, the driver sped away. (*Id.*)

The officers ran back to their car and followed the SUV. (*Id.* at 44:7-11.)  The driver ran one red light and then slowed down, at which point the petitioner and another man jumped out of the passenger side doors and ran to 997 Dekalb, a New York City Housing Authority building; one of the men dropped a cellphone as he ran from the car. (*Id.* at 44:14-45:18, 46:16-20, 69:2-7.)

---

[4] Photographic identifications were not generally admissible at trial under New York law as it existed at the time of the petitioner's trial.

At one point, the petitioner turned toward the patrol car, and fired two shots as the officers were getting out of the car.  (*Id.* at 46:5-8, 51:2-4.)  Officers Cevallos and Clerge yelled "gun," got their weapons out and chased the petitioner.  (*Id.* at 51:2-52:10.)  The petitioner turned around and pointed the gun a second time before he reached 997 Dekalb Avenue.  (*Id.* at 52:18-22).  He and the other man ran into the building, and the officers lost sight of them.  (*Id.* at 54:17-57:19.)

Multiple officers arrived at the scene of the shooting, including Officer Bagley and Detective Grandstaff.  (*Id.* at 169:8-12.)  Officer Bagley pointed out the cellphone that one of the men dropped during the chase, and Detective Grandstaff took it back to the precinct.  (*Id.* at 170:9-171:13.)  After it rang multiple times, Detective Grandstaff called one of the numbers that appeared on the screen, and the woman who answered agreed to come to the precinct.[5]  (*Id.* at 171:16-172:23.)

Officers arrested the petitioner at about 1:15 p.m. on May 22nd and brought him to the 81st  Precinct.  (*Id.* at 274:13-275:3.)  Detective Lamanque advised him of his constitutional rights, which the petitioner waived.  (*Id.* at 275:22-276:15, 280:22-25.)  He told Detective Lamanque that he was in front of 997 Dekalb Avenue that morning when "two males . . . jumped out and started shooting at him."  (*Id.* at 283:21-284:6.)  The petitioner ran into the building, and then went to a friend's home at 67 Stuyvesant Avenue. (*Id.* at 284:7-284:18.)  The petitioner was wearing a "white shirt, black pants, and white sneakers, and . . . had his hair pushed back."  (*Id.* at 286:14-15.)

Detective Lamanque put together a lineup with five fillers and gave each filler a white t-shirt and red bandana, the same clothing that the petitioner was wearing.  (*Id.* at 290:21-24,

---

[5] The woman did not testify at the petitioner's trial.

291:7-23, 299:22-230:7).  The petitioner chose position number five in the lineup.  (*Id.* at 294:6-11).  Officer Cevallos viewed the lineup and identified the petitioner as the shooter.  (*Id.* at 61:1-64:1.)

The earpiece of the petitioner's cellphone contained a mixture of DNA from at least two people; testing revealed that the mixture was 565 times more likely to include the petitioner's and two unknown contributors' DNA than three unknown contributors.  (*Id.* at 339:8-13, 348:4-10.)

   b.  The Defense's Case

The defense did not call any witnesses.

   c.  Verdict

On March 21, 2012, the jury acquitted the petitioner of Attempted Aggravated Murder (N.Y. Penal Law §§ 110.00, 125.26(1)(a)(i)) and Attempted Aggravated Assault Upon a Police Officer (N.Y. Penal Law §§ 110.00, 120.11), and convicted him of Criminal Possession of Weapon in the Second Degree (N.Y. Penal Law § 265.03(1)(b)).  (Tr. at 481:23-482:15.)

   d.  Sentencing

On April 26, 2012, Judge Marrus sentenced the petitioner as a predicate felony offender to fifteen years imprisonment followed by five years of post-release supervision.  (ECF No. 7-4 at 131.)

## POST-CONVICTION PROCEEDINGS

**I.  Motion to Vacate**

The petitioner, proceeding *pro se*, moved pursuant to Section 440.10 of New York's Criminal Procedure Law to vacate his conviction, claiming that the police and prosecutor fabricated evidence, and that his lawyer was ineffective.  On June 26, 2013, Judge Marrus denied

the motion, finding that the petitioner's claims were procedurally barred because there were sufficient facts in the record for review on direct appeal.  (ECF No. 7-5 at 55.)  Judge Marrus also rejected the petitioner's claim of ineffective assistance of trial counsel as "completely undermined by the fact that he was acquitted of the most serious charges . . . ."  (*Id.* at 55.)  On October 21, 2013, the Appellate Division denied the petitioner's application for leave to appeal. *People v. Browder*, No. 2013-07827, 2013 N.Y. Slip Op. 88870(U) (2d Dep't Oct. 21, 2013).

## II.    Direct Appeal & Habeas Petitions

The petitioner, represented by counsel, appealed his conviction to the Appellate Division, Second Department.  (ECF No. 7-5 at 59.)  He argued that the evidence against him was insufficient, and that the lineup was unduly suggestive.  (*Id.* at 82, 90.)  He also claimed that his trial lawyer was ineffective because he did not seek suppression of Officer Cevallos's lineup identification.  (*Id.* at 90)  Finally, he argued that his sentence was excessive.  (*Id.* at 100.)

The petitioner also filed a *pro se* supplemental brief in which he made additional attacks on his trial lawyer's performance—that he did not investigate the crime scene or search for additional witnesses, and did not argue "police and prosecutor falsification of evidence" and "actual innocence" at trial.  (*Id.* at 178, 180.)

On April 1, 2015, the Appellate Division affirmed the petitioner's conviction, finding that the "verdict of guilt was not against the weight of the evidence."  *People v. Browder*, 127 A.D.3d 777, 4 N.Y.S.3d 535 (2015).  The court also rejected the ineffective assistance of counsel claim as a "mixed claim" for which a CPL 440.10 proceeding was the appropriate forum.  *Id.*  Finally, the court found that the petitioner's sentence "was not excessive."  *Id.*  The Court of Appeals denied the petitioner's application for leave to appeal on July 13, 2015.  *People v. Browder*, 25 N.Y.3d 1198, 16 N.Y.S.3d 521 (2015).

In his *pro se* habeas petition in this Court, the petitioner renewed his arguments about the sufficiency of the evidence, about his lawyer's effectiveness and that his sentence was excessive. (ECF No. 1.)  The respondent opposed, asserting, among other things, that the petitioner had not exhausted his state court remedies on his ineffective assistance of counsel claim.  (ECF No. 7.) The petitioner requested a stay of this proceeding in order to exhaust his state court remedies. (ECF No. 12.)  I granted the stay.

In November of 2018, the petitioner filed a second *pro se* CPL 44.10 motion, in which he claimed for the first time that two fillers in the lineup pointed at him, leading to a "false" identification.  (ECF No. 27-1 at 2-20.)  The petitioner also objected to his lawyer's trial strategy; according to the petitioner, counsel should have challenged the identification procedures, objected to the crime scene detective's trial testimony, argued that the police and prosecutor falsified evidence, investigated the crime scene and located additional witnesses, and argued that the petitioner was innocent.  (*Id.*)

On June 28, 2019, the Honorable Craig Walker of the New York Supreme Court denied the petitioner's motion.  (ECF No. 27-2 at 2.)  Judge Walker declined to revisit the claims that the petitioner raised in his initial motion to vacate.  (*Id.* at 7.)  The court rejected the petitioner's claims about the lineup because there was "no indication that had defense counsel realized, at the time of the hearing, that one of the fillers was allegedly pointing at the petitioner, that the discovery would have led to the identification being suppressed by the court."  (*Id.* at 9.)  Finally, Judge Walker found that the petitioner had "not met his burden of demonstrating that defense counsel's representation fell below an objective standard of reasonableness;" defense counsel made appropriate objections at trial and cross-examined Detective Meadows about the ballistic evidence.  (*Id.*)  The Appellate Division, Second Department denied the petitioner's application

8

for leave to appeal.  (ECF No. 27-6.)

The petitioner filed an amended petition on November 20, 2019, making the same arguments about his trial lawyer and about the trial evidence.  (ECF No. 27.)  For the reasons that follow, the petition for a writ of habeas corpus is denied.

## LEGAL STANDARD

A federal court reviewing a habeas petition must not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  This doctrine applies to both substantive and procedural state law grounds.  *Id.* at 729-30.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits.  28 U.S.C. § 2254(a).  A federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision:  (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different

than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies

the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case.

*Id.* at 412-13.  The court reviews the last reasoned state court decision.  *Ylst v. Nunnemaker,* 501

U.S. 797, 804 (1991); *Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir. 2000).  The state court's

factual determinations are presumed to be correct, and the petitioner bears the burden of

rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

A petitioner can seek federal habeas corpus relief only after he exhausts his state court

remedies and gives the state courts a fair and full opportunity to review the merits of the

claim.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  In other

words, a petitioner must present "the essential factual and legal premises of his federal

constitutional claim to the highest state court capable of reviewing it."  *Jackson v. Conway*, 763

F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

## DISCUSSION

### I.   Sufficiency of the Evidence

An evidentiary sufficiency claim faces a "high bar" in federal habeas proceedings and is

subject to "two layers of judicial deference[;]" not only does the jury have broad discretion to

decide the case,[6] but a state court's decision on a sufficiency of the evidence challenge should

not be overturned unless it is "objectively unreasonable."  *Coleman v. Johnson*, 566 U.S. at 651.

Evidence is legally sufficient if "after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 309, 319 (1979) (emphasis in

---

[6] "[O]n direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (citing *Cavazos v. Smith*, 566 U.S. 1 (2011)).

original) (citations omitted).

The petitioner argues that the evidence against him was insufficient because the officer who identified him—Officer Cevallos—saw the shooter's face for "an instant, late at night," and then identified the petitioner at a "tainted" lineup.  (ECF No. 1 at 6.)  Federal courts considering the evidentiary sufficiency of a state conviction "must look to state law for 'the substantive elements of the criminal offense.'"  *Coleman*, 566 U.S. at 654 (citing *Jackson*, 443 U.S. at 324, n.16).  In New York, "[a] person is guilty of criminal possession of a weapon in the second degree when, with intent to use the same unlawfully against another, such person possesses a . . . loaded firearm."  N.Y. Penal Law § 265.03(1)(b).

A conviction "based on eyewitness identification will be set aside if the pre-trial identification procedure used was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'"  *Snow v. Reid*, 619 F. Supp. 579, 581 (S.D.N.Y. 1985) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).  The hearing court found that the lineup was not suggestive, and that conclusion was based on the evidence.  Officer Cevallos had a clear view of the gunman as he chased him, described him to a detective and identified him a short time later, first in a photographic array and then in a lineup.  (Tr. at 50:16-22, 61:1-3, 63:3-64:1).  Officer Cevallos testified at trial that he had "never been more certain" about an identification.  (*Id.* at 63:14.)  "Where an eyewitness had sufficient time to view the petitioner, was attentive to detail, the interlude of time between the crime and the identification was relatively brief, and the witness evinces a high degree of certainty in making the identification, these factors taken together make an identification sufficiently reliable to satisfy the *Simmons* standard for admissibility."  *Huber v. Schriver*, 140 F. Supp. 2d 265, 277 (E.D.N.Y. 2001).

11

Nor was Officer Cevallos's testimony the only evidence linking the petitioner to the shooting. The petitioner dropped his cellphone as he ran from the car that the officers were trying to stop; the prosecution presented DNA evidence that tied him to the phone. Moreover, the petitioner confirmed that he was near the building at the time of the shooting in his statement to Detective Lamanque.

The fact that the prosecution did not tie the bullet and shell casings at the scene to a particular gun or recover a gun from the shooting does not undermine the sufficiency of the evidence. To establish the petitioner's guilt of criminal possession of a weapon in the second degree, the prosecution had to establish that the petitioner possessed a loaded firearm with the intent to use it. N.Y. Penal Law § 265.03(1)(b). Officer Cevallos's testimony established that the petitioner possessed the gun and fired it at the police car; ballistics evidence recovered at the scene corroborated that testimony. [7]

Because the evidence was sufficient to establish the petitioner's guilt, the Appellate Division's decision was not "contrary to," or "an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d).

## II.   Ineffective Assistance of Counsel

A petitioner claiming that his lawyer was ineffective must meet the two-pronged test articulated in *Strickland v. Washington*: (1) "that counsel's representation fell below an objective

---

[7] The petitioner also faults the trial court for not giving the jury the definition of "possession of a loaded and operable firearm" and not asking the jury to determine if the bullet and shell casings met that definition. (ECF No. 27 at 24.) As an initial matter, this claim is unexhausted because the petitioner did not raise it on his direct appeals. 28 U.S.C. § 2254(b)(1); *O'Sullivan*, 526 U.S. at 842. Nor did either party request such an instruction at trial. In any event, a jury instruction violates due process only if it does not "give effect" to the requirement that "the State must prove every element of the offense." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam) (citing *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979)). Judge Marrus carefully explained the elements of criminal possession of a weapon in the second degree and instructed the jury that the prosecution bore the burden of proving each element beyond a reasonable doubt. (ECF No. 7-4 at 466:20-468:11.)

standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. 668, 694 (1984).  The Supreme Court has advised that in state habeas petitions this inquiry is "different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  Rather, a state court must be granted a "deference and latitude that are not in operation when the case involves a review under the *Strickland* standard itself."  *Id.*  A federal court "must determine what arguments or theories supported, or . . . could have supported, the state court's decision," and must then determine "whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  *Id.* at 102.  The standard was "meant" to be an exacting one; a state habeas petitioner must demonstrate that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement."  *Id.* at 102-03.

Under the first prong of *Strickland*, "[a] convicted petitioner . . . must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  "[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy."  *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986)).

To satisfy the second prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The level of prejudice the [petitioner] need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 693). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The petitioner's attorney mounted a vigorous and partially successful defense. Prior to trial, counsel persuaded the hearing judge to suppress one of the identifications, and then convinced the jury to acquit the petitioner of the most serious charges, charges on which he faced a maximum sentence of twenty-five years to life, and a minimum sentence of fifteen to life. The petitioner's complaints about counsel's performance are meritless.

The petitioner claims that counsel should have argued that the "lineup photograph clearly shows that the filler in position six was pointing directly at the petitioner in position five." (ECF No. 1 at 9.) Of course, the petitioner must first establish that the "underlying motion [would] be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990) (citing *Kimmelman*, 477 U.S. at 375-76). There is no evidence that a motion to suppress based on the petitioner's theory would have been successful. Even assuming that the lineup photograph shows a filler pointing at the petitioner, nothing in the record suggests he was doing so when Officer Cevallos looked at the lineup, or that Officer Cevallos even noticed him. As

14

Judge Walker ruled in denying the § 440.10 motion, there was "no indication" that had counsel argued for suppression of the lineup, it "would have led to [Officer Cevallos's] identification being suppressed by the court."  (ECF No. 27-2 at 9.)

A lineup is "unduly suggestive as to a given petitioner if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001) (*citing Israel v. Odom*, 521 F.2d 1370, 1374 (7th Cir. 1975) ("Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification.")).  In this case, the fillers were similar to the petitioner and the detective took steps to minimize any differences, for example by having everyone dressed in white shirts and bandanas.  Judge Reibach looked at the photograph of the lineup and determined that Officer Cevallos's identification was admissible at trial.  (ECF No. 7-1 at 37, 60.)  The petitioner has not demonstrated that the motion to suppress would have been meritorious, and has thus failed to establish that his trial counsel was ineffective for not raising it.

The petitioner also contends that his lawyer did not "investigate the crime scene" or search for additional witnesses.  (ECF No. 1 at 12.)  "The decision whether to call any witnesses on behalf of the [petitioner], and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987.), cert. denied, 484 U.S. 958 (1987); *see also United States v. DeJesus*, 57 F. App'x 474, 478 (2d Cir. 2003) ("A trial counsel's decision whether to call any witnesses on behalf of the petitioner, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial. Because of this inherently tactical nature,

15

the decision not to call a particular witness generally should not be disturbed.")  To succeed on a claim of ineffective assistance of counsel, a "petitioner may not merely allege that certain witnesses might have supplied relevant testimony, but must state exactly what testimony they would have supplied and how such testimony would have changed the result."  *Edmonds v. Purdy*, No. 08-CV-8808, 2009 WL 483189, at *19 (S.D.N.Y. Feb. 26, 2009).  The petitioner has not met this burden.

In an argument raised for the first time in his amended petition, the petitioner argues that counsel should have called someone named "DeMayo," who would "confirm that when petitioner ran to his house he never possessed a firearm;" the petitioner also says that "the video surveillance in the building" would confirm that he was not armed when he came into the building.  (ECF No. 27 at 27.)  Even accepting the premise of the petitioner's claim, "DeMayo" had nothing to say about what the petitioner was doing at the time of the shooting.  Similarly, any video surveillance from the building would be relevant only to what the petitioner did after the shooting.

Equally unavailing is the petitioner's argument that his trial counsel was ineffective for failing to argue that the police falsified evidence and that he was actually innocent.  "[I]t is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument[;] [c]ounsel is not obliged to advance every nonfrivolous argument that could be made."  *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001).  As an initial matter, in arguing that the witness identified the wrong person, counsel was arguing that the petitioner was innocent.  Nor was it ineffective for counsel to refrain from attacking the integrity of the police and prosecution.  That decision is precisely the kind of strategic choice that federal courts should not second guess.

16

Finally, the petitioner faults counsel for failing to challenge the testimony of crime scene Detective Shimicka Meadows on confrontation grounds.  (ECF No. 27 at 38.)  In *Crawford v. Washington*, the Supreme Court held that the confrontation clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the petitioner had a prior opportunity for cross-examination."  541 U.S. 36, 53-54 (2004).  There was no confrontation clause violation at the petitioner's trial.  Detective Meadows testified about what she did in connection with the crime scene, not about what anyone else did, and counsel cross examined her.  Counsel cannot be faulted for failing to raise a baseless objection.

The petitioner was convicted not because of any shortcomings on the part of his lawyer, but because the jury was persuaded by the evidence of his guilt.  The state courts' decisions denying the petitioner's ineffective assistance of counsel claims were neither contrary to nor an unreasonable application of clearly established law.

## III.   Sentencing

Finally, the petitioner argues that his sentence was excessive.  (ECF No. 1 at 10.)  "[A]n excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law."  *Pina v. Kuhlman*, 239 F. Supp. 2d 285, 288 (E.D.N.Y. 2003) (citing *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)).  Judge Marrus sentenced the petitioner to a determinate term of fifteen years to be followed by five years of post-release supervision, a permissible sentence for a Class C violent felony.[8]  N.Y. Penal Law § 265.03(1)(b); N.Y. Penal Law § 70.02.  Accordingly, the petitioner has not presented a federal constitutional issue for habeas review.

---

[8] The statutory range for a Class C violent felony in New York is three-and-a-half to fifteen years.

**CONCLUSION**

The petition for a writ of habeas corpus is denied in its entirety and the case is dismissed. A certificate of appealability will not be issued.  *See* 28 U.S.C. § 2253(c).  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith.


**SO ORDERED.**

                     ___s/Ann M. Donnelly_____
                     ANN M. DONNELLY
                     United States District Judge


Dated: Brooklyn, New York
        September 17, 2020